# IN THE COURT OF APPEALS OF IOWA

No. 17-1203
Filed October 25, 2017

**IN THE INTEREST OF I.A.,**
**Minor Child,**

**L.F.H., Mother,**
     Appellant.

_____

Appeal from the Iowa District Court for Scott County, Christine Dalton Ploof, District Associate Judge.

A mother challenges the termination of her parental relationship with her now three-year-old daughter. **AFFIRMED.**

Carrie E. Coyle of Carrie E. Coyle, P.C., Davenport, for appellant mother.

Thomas J. Miller, Attorney General, and Ana Dixit, Assistant Attorney General, for appellee State.

Brenda L. Drew-Peeples of Drew-Peeples Law Firm, Davenport, guardian ad litem for minor child.

Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

"Parents need to be gatekeepers." In that nub of its ruling, the juvenile court explained why three-year-old I.A. cannot be safely reunited with her mother, Laura. In its order terminating parental rights, the juvenile court offered a balanced accounting of Laura's strengths and weaknesses as a parent. But ultimately the court decided Laura's inability to assess the risk of harm posed by dangerous individuals stood in the way of reunification with her daughter. After reviewing the record,[1] we reach the same decision as the juvenile court and affirm the termination order.

Laura challenges the statutory grounds for termination and alleges the Iowa Department of Human Services (DHS) did not live up to its mandate to provide best efforts toward reunification because the caseworker failed to increase visitation. Highlighting her strong bond with I.A., Laura also argues termination was not in the child's best interests.

## I.      Facts and Prior Proceedings

I.A.'s mother, Laura, has mild intellectual disabilities and has been diagnosed with anxiety, panic disorder, narcissistic personality traits, and depression. The juvenile court determined that Laura's mental-health issues have led her to make "extremely bad choices" concerning the well-being and safety of her daughter. In August 2015, the DHS received reports of mutual

---

[1] We review termination-of-parental-rights proceedings de novo, meaning we examine both the facts and law and adjudicate anew those issues properly presented. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). We are not bound by the juvenile court's factual findings, but we give them weight, especially when witness credibility is critical to the outcome. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). The State's proof must be clear and convincing; in other words, the evidence should leave no "serious or substantial doubts as to the correctness [of] conclusions of law" drawn from it. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (citation omitted).

domestic violence occurring between Laura and her boyfriend Chad[2] while I.A. was present. In November 2015, authorities removed then one-year-old I.A. from Laura's care. The removal order noted the turbulent relationship between Laura and Chad, as well as Chad's history of child abuse. The DHS placed I.A. with a foster-care family where she has stayed for the duration of the case. In early March 2016, the juvenile court adjudicated I.A. as a child in need of assistance (CINA) under Iowa Code section 232.2(6)(c)(1), 232.2(6)(c)(2), 232.2(6)(d), and 232.2(6)(n) (2016).

At the time of the CINA adjudication, the mother was not attending to her mental-health needs and was abusing controlled substances. But after the adjudication, Laura embraced the services offered by the DHS. Her FSRP (family safety, risk and permanency) worker recalled Laura's "willingness to participate in anything suggested" to help her become a better parent. The FSRP worker also found Laura was well-prepared, "very attentive," and nurturing during her supervised visitations with I.A.

In a permanency order issued in late December 2016, the juvenile court expressed its belief that Laura "could actually reunify with her daughter if given additional time." The court noted Laura was attending to her mental-health needs, had ended her relationship with Chad, and completed substance-abuse treatment. The court continued: "Most significant is that Laura demonstrates good parenting in a supervised setting." But the court also sounded concerns

---

[2] Laura identified Chad as I.A.'s father on her daughter's birth certificate, but paternity testing later determined Chad was not the biological father. The biological father, Charles, was not interested in parenting I.A. The juvenile court's termination of the parental rights of these fathers is not at issue on appeal.

about the mother's continuing "chaotic" personal relationships and her struggle to maintain her emotional stability.

In a January 2017 report, I.A.'s guardian ad litem (GAL) highlighted some additional worries about Laura's stability. Notably, Laura was pregnant and involved with a new paramour, but she had not provided the DHS with background information about any individuals who might have interactions with I.A.[3] The GAL also expressed concern that Laura was "currently not addressing her mental health issues with therapy." Considering the GAL report, the juvenile court conveyed less optimism than it had the month before about Laura's progress:

> Her parenting skills remain very good but her stability has once again been called into question. . . . The Court is concerned about whether or not Laura has the ability to evaluate the people around her as safe for her and her child, and whether she has personal mental stability consistent enough to care for a young child full time and unsupervised.

In the following month, February 2017, the State filed its petition for termination of parental rights. The juvenile court held a hearing in May 2017. The DHS caseworker and FSRP worker both testified Laura had been cooperative with services and did "really well" at visitations. But both workers echoed the nagging fear that Laura was not able to shield I.A. from unsafe people who insinuated themselves into the mother's life. As an example, just as the DHS worker was considering increasing Laura's visitation, Laura tested positive for marijuana. Laura denied using the drug and explained that her ex-roommate was smoking marijuana and the test was positive through exposure.

---

[3] During the child-welfare case, Laura was married to Josh, who assaulted her in early 2017 in the presence of Laura's older daughter.

The DHS caseworker testified that even if Laura's explanation was true, her choice of roommates was concerning and followed a pattern of Laura allowing unsavory characters to take advantage of her nature. The FSRP worker also testified she was concerned about Laura's reluctance to continue with in-person therapy: "[S]he's communicated that she is tired of attending therapy" and was turning to Facebook support groups instead.

Laura testified she was willing to go back to counseling. She explained she recently took in the roommate because she was scared of Josh and "didn't want to be by [herself]." Laura also testified she requested more extensive visitation "multiple times" but it was never arranged. Laura asked the court for more time before her parental rights were terminated.

In July 2017, the juvenile court issued an order terminating Laura's parental rights under section 232.116(1)(d) and (h). The court decided "[t]he history of this case clearly demonstrates that reasonable efforts were undertaken to prevent or eliminate the need for removal of the child from the parental home." The court also concluded termination of the parent-child relationship was in I.A.'s best interests. *See* Iowa Code § 232.116(2). Laura now challenges those conclusions.

## II. Analysis of Laura's Arguments

### A. Did the State offer clear and convincing proof of the statutory elements?

Laura challenges both grounds for termination cited by the juvenile court. To affirm, we need to find facts to support just one of the sections. *In re A.J.*, 553 N.W.2d 909, 911 (Iowa Ct. App. 1996), *overruled on other grounds by In re P.L.*,

778 N.W.2d 33, 39 (Iowa 2010). We focus our analysis on subsection (h). Under that subsection, the State must prove with clear and convincing evidence: (1) the child is three years of age or younger, (2) she has been adjudicated a CINA, (3) she has been out of her parent's physical custody for at least six of the last twelve months or the past six consecutive months, and (4) she cannot be returned to the custody of her parent at the present time. Iowa Code § 232.116(1)(h); *see In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (identifying relevant time in fourth element as date of termination hearing).

Laura contends the State did not prove the elements of subsection (h) due to "a failure by the Department to provide reasonable efforts." The DHS is required to make every reasonable effort to return a child to her home— consistent with the child's best interests. Iowa Code § 232.102(7). While the duty to make reasonable efforts is not "a strict substantive requirement of termination," the extent of the measures taken by the DHS "impacts the burden of proving those elements of termination which require reunification efforts." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). In considering reasonableness of the nature and extent of visitation offered by the DHS, the best interests of the child are controlling. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996).

Laura asserts it was "unfortunate" visitation could not be extended to allow her more time to bond with I.A. The DHS worker acknowledged at the termination hearing that Laura did request more visits and the worker did "not plan that well"—so she was unable to accommodate that request before taking a personal medical leave during the pendency of the case. But the worker believed even expanded visits would have remained at least partially supervised.

While expanded visitation may have been appropriate, we nevertheless conclude the DHS reunification efforts in this case were reasonable. The FSRP worker provided education on parenting skills and child development "one on one with a work book and hands-on demonstrations during visits. Due to Laura's cognitive disability, services were explained repeatedly to her so she had time to grasp the harder concepts." Additional visits with I.A., even with scaled-back supervision, would not have allayed the professionals' lingering unease that Laura did not have sufficient protective capacities to keep her daughter out of harm's way. As the juvenile court aptly summarized: "Despite one and a half years of services, Laura still relies on the Department to negotiate who is a dangerous person for her child and who is not." After our de novo review of the record, we reach the same conclusion as the juvenile court: I.A. could not safely be returned to Laura's custody at the time of the termination hearing.

## B. Did terminating the parent-child relationship serve I.A.'s best interests?

After concluding the State has proven a statutory ground for termination, we still must conclude termination is in I.A.'s best interests. *See In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012). We consider three statutory factors: (1) the child's safety, (2) the best placement for furthering her long-term nurturing and growth, and (3) her physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); *see also P.L.*, 778 N.W.2d at 37. We also assess "whether the child has become integrated into the foster family to the extent that the child's familial identity is with the foster family, and whether the foster family is able and

willing to permanently integrate the child into the foster family." Iowa Code § 232.116(2)(b).

Laura asserts the bond she shares with I.A. is a compelling reason not to terminate her parental rights. Closeness between a parent and child is indeed a mitigating factor provided in Iowa Code section 232.116(3)(c). But the closeness of the parent-child relationship does not automatically outweigh other factors in support of termination. *See In re N.F.*, 579 N.W.2d 338, 341-42 (Iowa Ct. App. 1998). The record shows Laura developed sound parenting skills and engaged well during her visits with I.A. But we must balance those positive steps against the risk to I.A. posed by Laura's indiscriminate associations with dangerous individuals.

In deciding what placement is in I.A.'s best interests, we also take into account that I.A. has been living with the same foster parents since she was removed from Laura's care. By all accounts, she is comfortable and well-adjusted in their home. She is hitting her developmental milestones. And her foster fathers are interested in adopting I.A. On this record, we find termination of Laura's parental rights is in I.A.'s long-term best interests.

**AFFIRMED.**